Cora E. SHERRILL, Individually and as Administratrix of the Estate of Max O. Sherrill, deceased, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, a corporation, et al., Defendants.

Timothy P. JONES, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, a corporation, et al., Defendants.

David Alfred LOWRY, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, a corporation, et al., Defendants.

David S. SCHWARTZ, as Administratrix of the Estate of James C. Owen, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, a corporation, et al., Defendants.

Murray Robert COLE, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, a corporation, et al., Defendants.

Shereen Ramona ZIPFEL, Individually and as Administratrix of the Estate of Ian Charles Zipfel, deceased, Plaintiff,

v.

HALLIBURTON CO., et al., Defendants.

Ten Fong CRAIG, Individually and as Administratrix of the Estate of William Henry Craig, deceased, Plaintiff,

v.

ATLANTIC RICHFIELD CO., et al., Defendants.

CHAN LUCK CHEE, Plaintiff,

v.

McCLELLAND ENGINEERS, INC., et al., Defendants.

Patrick Paul GRUNKE, Plaintiff,

v.

ATLANTIC RICHFIELD CO., et al., Defendants.

Vyner Gerard ALBUQUERQUE, Plaintiff,

v.

OCEANEERING INTERNATIONAL, INC., et al., Defendants.

Michael Wayne CRAIG, Plaintiff,

v.

BRINKERHOFF MARITIME DRILLING, et al., Defendants.

Nos. C-82-0836-WWS, C-82-2565-WWS, C-82-2566-WWS, C-82-2568-WWS, C-82-2569-WWS, C-83-0603-WWS to C-83-0607-WWS and C-83-1022-WWS.

United States District Court, N.D. California.

Aug. 9, 1985.

John A. Waner, Waner, Beaman & Boyer, Santa Rosa, Cal., Frank M. Staggs, Jr., O'Quinn & Hagens, Houston, Tex., Lyle C. Cavin, Jr., San Francisco, Cal., Benton Musslewhite, Harold Eisenmann, Schechter, Eisenmann & Solar, John P. Forney, Eastman, Watson, Dale & Forney, Houston, Tex., Joel F. Citron, Santa Monica, Cal., Robert R. Catalano, Catalano & Gates, San Jose, Cal., for plaintiffs.

Ernest N. Reddick, Derby, Cook, Quinby & Tweedt, Graydon S. Staring, Lillick, McHose & Charles, Harold A. Stone, Gudmundson, Siggins & Stone, Vernon L. Goodin, Bronson, Bronson & McKinnon, Robert J. Finan, Finan, White & Morrison, San Francisco, Cal., James M. Derr, Belcher, Henzie, Biegenzahn & Walker, Los Angeles, Cal., William H. Westover, Morris Davidovitz, Fisher & Hurst, San Francisco, Cal., for defendants.

### MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Before the Court are eleven actions brought by or on behalf of seamen who were killed or injured in an air crash in Indonesia. These actions were related pursuant to Local Rule 205–2 for assignment to a single judge; they have, however, not been consolidated. Pursuant to the court's assignment plan they were later reassigned from that judge to the undersigned.

Prior to the reassignment, defendants filed motions to dismiss for forum non conveniens. The motions were denied by another judge of this court. Following reassignment, defendants renewed their motions. The Court granted those motions by order of June 10, 1985, but on reconsideration vacated its order on July 25, 1985. The motions are now before the Court for renewed consideration and decision.

## I.

### FACTS

The facts material to the disposition of these motions are undisputed and are briefly summarized below.

On April 28, 1981, an aircraft operated by P.T. Airfast Services ("Airfast"), an Indonesian corporation, crashed on approach for landing at Simpang Tiga Airport, Pekanbaru, North Sumatra, Indonesia. The aircraft had been chartered by Hudbay Oil (Malacca Strait) Limited ("Hudbay") to transport employees of Brinkerhoff Maritime Drilling Corporation ("BMD") between Singapore and Pekanbura, Sumatra. From the airport at Pekanbaru, the passengers were to be transported by helicopter to the drilling barge Brinkerhoff I, then operating in the Straits of Malacca in Indonesian waters.

The Brinkerhoff I is an American flag drilling barge, registered in San Francisco, California, owned by BMD, a Delaware corporation with its home office in San Francisco. In October 1979, BMD entered into a Day-Work Drilling Contract with Atlantic Richfield Indonesia, Inc., ("ARII"), negotiated in Indonesia. Pursuant to this contract, BMD agreed to furnish and operate the Brinkerhoff I in areas of operations

designated by ARII. In February, 1981, ARII directed BMD to move the barge to a lease concession operated by Hudbay. ARII and Hudbay executed an agreement for use of the barge in March, 1981, governing the drilling services to be performed by her on Hudbay's lease concession. Essentially, that agreement provided that BMD would perform drilling operations for Hudbay as instructed by ARII.

The crew of the Brinkerhoff I lived on board the vessel and rotated their time on and time off in two-week increments. They were shuttled between Indonesia and Singapore in the Airfast aircraft chartered by Hudbay under its contract with ARII. The crash occurred as members of the crew were returning to Indonesia enroute to the drilling barge. At the time of the crash, the aircraft was in contact with Indonesian air traffic controllers at Simpang Tiga Airport. Indonesian authorities subsequently investigated the crash and issued a report attributing it to pilot error and weather conditions. The crew and five of the thirteen passengers on the plane died in the crash; others were injured.

These actions are brought by or on behalf of ten of the passengers, all of whom were employed on the Brinkerhoff I at the time. All are brought under the Jones Act, 46 U.S.C. § 688, and most also allege claims under general maritime and California common law.

Four of the actions are brought on behalf of three American seamen:

C–82–0836: brought on behalf of Max Sherill, a United States citizen and resident of New Mexico at the time of his death in the accident, by the administratrix of his estate, also a United States citizen and resident of New Mexico.

C–82–2568: brought on behalf of James Owen, a United States citizen and resident of Minnesota at the time of his death in the accident, by the administratrix of his estate.

C–83–0604: brought on behalf of Wm. Henry Craig, a United States citizen and resident of California at the time of his death in the accident, by Ten Fong Craig, as administratrix of his estate.

C–83–1022: brought on behalf of Wm. Henry Craig, by his executor and heirs, United States citizens and residents of California.

The remaining actions are all brought by or on behalf of seamen none of whom was a citizen or resident of the United States:

C–82–2565: brought by Timothy Peter Jones, a British subject residing in Britain.

C–82–2566: brought by David Lowry, a citizen of Canada residing in Canada or Singapore.

C–82–2569: brought by Murray Robert Cole, a citizen of New Zealand residing in the Phillipines.

C–83–0603: brought by Shereen Zipfel, a citizen of Singapore, as administratrix of the estate of Ian Charles Zipfel, a British subject then residing in Britain or Singapore.

C–83–0605: brought by Chan Chuck Lee, a citizen and resident of Singapore.

C–83–0606: brought by Patrick Paul Grunke, a citizen and resident of Australia.

C–83–0607: brought by Vyner Gerard Albuquerque, a citizen and resident of Singapore.

## II.

### RECONSIDERATION

■ The threshold question confronting the Court is whether to reconsider the prior denial of the motions by another judge. Plaintiffs argue that the denial is the law of the case and bars reconsideration. The Court is mindful of the institutional and policy considerations militating against reconsideration of an earlier ruling by a judge of the same court. As a rule "the various judges who sit in the same court should not attempt to overrule the decisions of each other...." *Castner v. First National Bank of Anchorage,* 278 F.2d 376, 379 (9th Cir.1960) (citing *Shreve v. Cheesman,* 69 F. 785, 791 (8th Cir.1895)). This rule is premised upon principles of

comity and uniformity, and the need to preserve the orderly functioning of the judicial process. *Castner, supra,* 278 F.2d at 379–380. But it does not raise an absolute bar to reexamining questions previously determined. It is well established in this circuit that one district judge in a multi-judge court may modify or overrule an interlocutory order of another judge sitting in the same case for "cogent reasons" or where "exceptional circumstances" are presented. *Greyhound Computer Corp. v. IBM,* 559 F.2d 488 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *United States v. Desert Gold Mining Co.,* 433 F.2d 713 (9th Cir.1970); *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804 (9th Cir.), *cert. denied,* 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); *Castner, supra.* Thus it makes no difference whether the interlocutory order is reconsidered by the same judge or by a different judge to whom the case has been reassigned. *United States v. Desert Gold Mining Co.,* 433 F.2d 713, 715 (9th Cir.1970).

In the prior order denying the motions, filed October 14, 1983, the court stated the issue to be "whether [it] should retain these cases and try them under the Jones Act, or whether plaintiffs should be remitted to appropriate proceedings elsewhere." (Order p. 1023) It then analyzed and discussed at some length the issue whether plaintiffs could maintain a claim under the Jones Act. The court concluded that "American law [applies] to all actions, and retain[ed] jurisdiction." It went on to add: "The Court does no more at this time than decide the choice-of-law question." (p. 1025) The motions to dismiss for forum non conveniens were, however, denied without further discussion. By order filed January 16, 1984, the court, pursuant to 28 U.S.C. § 1292(b), certified for an interlocutory appeal only this question: "What law, United States law (i.e. the Jones Act), or foreign law, applies to this matter." After further proceedings in which the court made certain additional findings (by order filed October 29, 1984), the court of appeals

denied the petition for an interlocutory appeal.

The status of these motions at this time, therefore, is that while the court denied them, a ruling from which no appeal was sought, it did not expressly decide the forum non conveniens issue. As plaintiffs themselves have said in a memorandum filed following the ruling: "While this Court did not expressly decide the *forum non conveniens* issue ... it did deny the *forum non conveniens* motions." (Response of plaintiffs in opposition to defendants' joint motion for issuance of formal findings of fact to enable appeal to proceed, filed Sept. 5, 1984, p. 23)

Presumably the court considered itself bound by its ruling applying the Jones Act to all of these actions to deny the motions for forum non conveniens. As hereafter discussed, the Supreme Court's decision in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), not considered in the prior ruling, requires reexamination of the assumption on which the court acted.

■ More importantly, the court made its ruling premised on the propriety of the so-called "global treatment" of all of these cases. The Ninth Circuit, however, undercut this premise in *Phillips v. Amoco Trinidad Oil Co.,* 632 F.2d 82, 89 (9th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981), when it said:

> But the allegiance of the injured seaman has always been viewed as a relevant and important consideration in determining the appropriate law to apply. *We know of no authority for the view that foreign nationals may predicate a right to have American law applied on the rights of similarly situated American citizens.* The suggestion that one follows from another is another "variety of social jingoism, which presumes that the 'liberal purposes' of American law must be exported to wherever our multinational corporations are permitted to do business." (Emphasis added)

Cogent reasons therefore exist for reconsideration of the prior ruling.

## III.

### CHOICE OF LAW

■ All plaintiffs bring their actions pursuant to the Jones Act, which states in part that "[a]ny seaman who shall suffer personal injury in the course of his employment, may ... maintain an action for damages at law, ...." 46 U.S.C. § 688. The Act applies to the death or injury of seamen occurring while being transported by their employer to or from the vessel. See e.g., *Higginbotham v. Mobil Oil Corp.*, 545 F.2d 422, 433 (5th Cir.1977) (Jones Act applied to seaman killed in crash of helicopter ferrying him from drilling rig). For purposes of these motions, the Court assumes that plaintiffs or their decedents were seamen for Jones Act purposes.

The choice of law rule which governs application of the Act was laid down in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). The Court there identified the eight factors controlling the determination whether the Act applies: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured party; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations.[1]

*Lauritzen* requires courts in applying these factors to compare the substantiality of this country's interest in a given action with that of other nations. Conflicts between competing laws are resolved by "ascertaining and valuing [the enumerated] points of contact between the transaction and the states or governments whose competing laws are involved." 345 U.S. at 582, 73 S.Ct. at 928. *Rhoditis* emphasized that application of the *Lauritzen* factors is not mechanical, but requires courts carefully to review and weigh each factor "in light of the national interest served by assertion of

the Jones Act jurisdiction." 398 U.S. at 309, 90 S.Ct. at 1734.

*Lauritzen* and *Rhoditis* contemplated ocean-going vessels generally, true maritime vessels that ply the seas as an integral part of the shipping industry. As to these vessels, Gilmore and Black state:

American law will ... be applied in actions brought on account of injuries suffered on American-flag ships, whether the plaintiffs are American or foreign, resident or non-resident, seamen, harborworkers, passengers, guests or, for that matter, pirates. By taking out registry in this country, the shipowner consents in effect to the application of the law of the United States. This proposition has seemed so self-evident that it appears never to have been questioned.

G. Gilmore & C. Black, *The Law of Admiralty* at 477 (2d ed. 1975).

If the Brinkerhoff I were a traditional ocean-going vessel, so that the place of injury of any particular seaman would be fortuitous, the law of the flag would be of paramount importance. The rationale for this result rests "on the pragmatic basis that there must be some law on shipboard, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns [the ship]." *Lauritzen*, 345 U.S. at 585, 73 S.Ct. at 930. For the same reason, the allegiance of the shipowner and the shipowner's corporate base of operations are also significant factors under *Lauritzen* and *Rhoditis*. Defendants concede that if these factors were controlling, American law should be applied to all these actions.

■ The relative value attached to these factors has undergone change, however, as they have come to be applied to drilling rigs. Such vessels differ from traditional ocean-going vessels in that they move comparatively infrequently and only over short distances. As a result the element of fortuity in the place where an accident occurs

---

**1.** *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), extended the principles enunciated in *Lauritzen* to cases involving general maritime law.

has been largely eliminated. *Phillips v. Amoco Trinidad Oil Co., supra,* 632 F.2d at 87; *Koke v. Phillips Petroleum Co.,* 730 F.2d 211 (5th Cir.1984); *Bailey v. Dolphin International, Inc.,* 697 F.2d 1268 (5th Cir. 1983); *Vaz Borralho v. Keydril Co.,* 696 F.2d 379 (5th Cir.1983); *Chiazor v. Transworld Drilling Co.,* 648 F.2d 1015 (5th Cir.) reh'g denied, 659 F.2d 1075 (5th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Zekic v. Reading & Bates Drilling Co.,* 536 F.Supp. 23 (E.D. La.1981), *modified* 680 F.2d 1107 (5th Cir. 1982). In drilling rig cases, therefore, the place of the wrong, the domicile of the injured person and the place where the contract was made take on greater significance than other factors. *Phillips,* 632 F.2d at 87. For the same reason, the corporate base of operations is considered of less significance than the base of day-to-day operations. *Koke v. Phillips Petroleum Co.,* 730 F.2d at 220; *Vaz Borralho v. Keydril Co.,* 696 F.2d at 389.

Plaintiffs argue that the Brinkerhoff I is more akin to a traditional blue water vessel than a fixed drilling rig, noting that she moves from drilling site to drilling site in various Far Eastern Seas.[2] In its order of October 11, 1983, the court observed that the Brinkerhoff I "appears to have been a

**2.** Plaintiffs also argue that the Ninth Circuit's order of June 21, 1984, denying interlocutory review, indicates that the Ninth Circuit considered the Brinkerhoff I as a traditional vessel rather than a drilling rig. The Ninth Circuit stated in part:

> [W]e do not have an adequate record for review. We note, for example, the lack of a finding on the question of the shipowner's base of operations, and the lack of clear evidence on the places where the contracts of employment may have been made. See generally *Hellenic Lines v. Rhoditis,* 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252 (1970). If the district court and the parties create a better record for review before the proceedings have continued so far as to discourage interlocutory action, we see no reason why the defendants may not request a certification for interlocutory appeal from the district court again.

This clearly was not a ruling on the vessel's status.

**3.** In its order of October 22, 1984, the court made the following additional findings of fact,

stationary vessel rather than one that travelled the international seas," but nonetheless considered the law of the flag a substantial factor.[3] The undisputed facts show that the Brinkerhoff I did not move under her own power, having to be towed by other vessels, and is described in the Certificate of Registry as a "barge." Although she was moved to various drilling locations in Indonesian and other South East Asian waters, she was not in any sense a traditional maritime vessel "plying the seas as an integral part of the shipping industry." *Chiazor, supra,* 648 F.2d at 1018. The drilling rig analysis applies to drilling vessels that remain stationary or move only infrequently and over short distances. *Nicol v. Gulf Fleet Supply Vessels, Inc.,* 743 F.2d 289, 297 (5th Cir.1984). Between 1979 and February, 1983, the Brinkerhoff I operated at the following locations:

| | |
|---|---|
| June 1979—Sept. 1979 | — South China Sea |
| Sept. 1979—Nov. 1979 | — Singapore Harbor |
| Nov. 1979—April 1981 | — Java Sea |
| April 1981—June 1981 | — Malacca Straits |
| June 1981 | —to Singapore Harbor for ten days of repairs |
| June 1981—Feb. 1983 | — Java Sea |

This record shows that the Brinkerhoff I, while not at a single fixed location, spent

without analysis, however, of their significance to the choice of law in these cases:

1. The place of the wrongful act is Indonesia.
2. The law of the flag is the United States.
3. The allegiance or domiciles of the injured parties are as follows: three of the plaintiffs are United States citizens. Of the remaining seven plaintiffs, two are citizens of Singapore and the others are domiciliaries of Canada, Australia, the United Kingdom and New Zealand.
4. The allegiance of the defendant shipowner is the United States.
5. The employment contracts were entered into "in foreign locations."
6. Foreign forums in either Singapore or Indonesia are accessible to the plaintiffs.
7. The law of the forum is American.
8. The relevant base of operations of the vessel Brinkerhoff I was either Singapore or Indonesia, or both. The overall base of the corporate shipowner defendant, BMD, was in San Francisco, California.

long periods of time at only a few drilling locations in the general vicinity of Indonesia.

These undisputed facts and the court's prior findings viewed in the light of *Phillips, supra,* and the other cited cases, compels the conclusion that the Brinkerhoff I was a drilling vessel for purposes of applying choice of law rules.

In its prior ruling denying the motions, the court declined to follow *Phillips* because of the "presence of American plaintiffs" and the fact that "most of the remaining plaintiffs are English-speaking." (Order of Oct. 12, 1983, p. 8). *Phillips,* however, does not turn on the fact that all of the plaintiffs were Trinidad citizens. It was because of the stationary character of the operation in which plaintiffs were injured or killed that the court of appeals gave controlling weight to the place of the wrongful act, the allegiance and domicile of the workers, the place of contract, and the base of the operation.

Nor is it relevant that all of the factors do not coincide in a single country. As the court held in *Bailey v. Dolphin International, Inc., supra,* 697 F.2d at 1277–78:

> It is certainly true that where the factors emphasized in *Chiazor* [and *Phillips* ] all coincide in one country, the choice of law determination points strongly to the application of that country's law, but it does not follow that the application of American law is required, as if by default, when these factors are spread among several other foreign countries, and the only contact with the United States remains ultimate American ownership or control of the business ventures engaged in the drilling operation.

Further, the *Bailey* court specifically rejected the argument made by plaintiffs here that the involvement of several countries shifts greater emphasis to the place of ownership and base of operations. The court stated:

> [T]he substantiality of the base of operations factor or the law of the domicile of the ultimate owner, in an offshore drilling rig non-traditional maritime context,

does not increase merely because the factors given added significance in *Chiazor* are spread among more than one foreign nation.

> *Id.*

See also *Martyn v. Transworld Drilling Company Ltd.,* No. 78–3423 (E.D.La. November 29, 1979), *aff'd* 619 F.2d 82 (5th Cir.1980) (American law not applied where Irish citizen injured on American-owned drilling platform in the North Sea off the coast of the United Kingdom); *Zekic v. Reading & Bates Drilling Co., supra* (Italian, not American law, applied where Yugoslavian citizen injured in Italian territorial waters on American-owned drilling rig flying American flag.)

■ Finally, as *Phillips* makes clear, the mere presence of American plaintiffs is not sufficient to entitle foreign plaintiffs to have the Jones Act applied to their cases. *Phillips, supra,* 632 F.2d at 89. A closely analogous decision is *In Re Ocean Ranger Sinking Off Newfoundland,* 589 F.Supp. 302 (E.D.La.1984), involving consolidated actions arising from the sinking of the Ocean Ranger, an oil drilling vessel, off the coast of Newfoundland, Canada. American and Canadian crewmen died in the accident. Both the law of the flag and the "ultimate base of corporate operations" were American. The place of the wrongful act and the day-to-day base of operations were Canadian. The allegiance of the injured seamen and the place of the contract were divided between this country, as to those actions filed as a result of the deaths of American crewmen hired in America by American companies, and Canada, as to those actions filed as a result of the deaths of Canadian crewmen hired in Canada by Canadian companies. The court cautioned that this unique combination of choice of law factors mandated a result different from previous drilling rig cases. Specifically, the court concluded that American law applied to those actions filed as a result of the deaths of American crew members and Canadian law applied to those actions filed as a result of the deaths of

Canadian crew members. The court explained its decision as follows:

> In the actions filed as a result of Canadian deaths, all four of the factors given added significance in the drilling rig context, allegiance of the seamen, place of the wrongful act, and day-to-day base of operations, point toward application of Canadian law. These factors are not outweighed by the fact that the law of the flag and the ultimate base of operations were American, especially in the drilling rig context. In the actions filed as a result of American deaths, two of the four factors given added significance in the drilling rig context, place of the wrongful act and day-to-day base of operations, point toward the application of Canadian law and the allegiance of the seamen, point toward application of American law. However, as to the actions filed as a result of American deaths, the fact that the law of the flag and the ultimate base of corporate operations were American does tip the balance in favor of applying American law.

*Id.* at 320.

The court expressly rejected plaintiffs' argument that the Ocean Ranger drilling operation be viewed as a single "shipping transaction" "requiring one catholic choice of law determination." 589 F.Supp. at 320 n. 21. The court instead considered each crew member's employment as a maritime transaction for which a choice of law determination must be made. The court noted that "the appropriateness of this approach is evident from analysis of the multifactor *Lauritzen-Rhoditis* test itself, which contains two factors, allegiance of the seaman and place of the contract, that explicitly require individualized treatment." *Id.*

Plaintiffs here contend that the same choice of law should apply to all plaintiffs, whether American or foreign seamen. First, they argue that the "global solution" as to choice of law, employed by the court in *In Re Paris Aircrash of March 3, 1974,* 399 F.Supp. 732 (C.D.Cal.1975), applies here. Although plaintiffs there included domiciliaries of twenty-four nations, the court applied California law on damages to their consolidated claims. The case is of little relevance here, however, because the only issue in litigation was the amount of damages recoverable for a tort committed in California. The interest of California in having its damage law applied where the aircraft in suit was designed, constructed, manufactured and tested in California warranted uniform treatment of all claims.

Plaintiffs also rely on *Industrial Development Corporation v. Mitsui & Company,* 671 F.2d 876 (5th Cir.1982) *vacated and remanded on other grounds,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *rev'd and remanded,* 704 F.2d 785 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983). That case holds merely that the doctrine of forum non conveniens does not apply to actions under the Sherman Act and, even if it did, would not permit dismissal of such an action on the ground that a foreign country is a more convenient forum. Moreover, the court observed, requiring the same parties to litigate two suits in different forums would not be consistent with the doctrine. Here, of course, different parties would be involved in the various actions.

Plaintiffs also argue that the Shipowners Liability (Sick and Injured) Convention of 1936, 54 Stat. 1693, guarantees "equality of treatment to all seamen [injured on the high seas] irrespective of nationality, domicile or race." 54 Stat. 1700. Plaintiffs interpret this provision to mean that American law must apply to all foreign seamen serving on American-owned or American flag vessels. But this treaty does not give aliens access to American courts; it relates only to shipowners' liability for maintenance and cure of seamen. Norris, *The Law of the Seamen,* § 605, 150–152 (3d ed. 1979). Further, such an interpretation would render nugatory the weighing of factors mandated by *Lauritzen* and *Rhoditis.* The Fifth Circuit criticized this argument in *In Re McClelland Engineers, Inc.,* 742 F.2d 837, 839 (5th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985), as "represent[ing] a

candidly novel and clear departure from our holdings and those of the Supreme Court."

■ The Court, therefore, concludes that settled law requires it to determine the applicable law with respect to each plaintiff in light of the relevant factors as they affect that plaintiff.

The factors entitled to the greatest weight in this case point to the application of foreign law here: as to each of the seamen, the place of the alleged wrongful act was Indonesia, the base of operations was Indonesia or, to a lesser extent, Singapore, and the employment contracts or other hiring arrangements were made in foreign locations.

■ With respect to those plaintiffs or their decedents whose allegiance or domicile was foreign, these factors require a finding that the Jones Act does not apply to their actions.[4]

With respect to the four actions on behalf of three American seamen, the defendants do not dispute the applicability of the Jones Act and the Court so finds.

## IV.

## FORUM NON CONVENIENS

■ The doctrine of forum non conveniens permits a court to decline to exercise its jurisdiction for prudential reasons. While the doctrine leaves much to the trial court's discretion, the principal relevant factors to be considered are well-established. They include, first, those relevant to the litigant's private interest: relative ease of access to sources of proof; availability of compulsory process for and the cost of obtaining the attendance of witnesses; possibility of a view of the premises; and other practical problems of conducting an expeditious and economical trial.

Second, there are factors bearing on the public interest: docket congestion of the

court in which the action was filed; compelling jurors to serve on cases in which the community has no interest; the preference for having localized controversies decided at home; and the interest in having the action tried in the forum whose law will be applied. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507–9, 67 S.Ct. 839, 842–43, 91 L.Ed. 1055 (1947).

Because the Court has determined that the foreign seamen are not entitled to the application of American law while the American seamen are, their cases must be separately analyzed.

### A. Foreign Seamen

#### 1. Availability of an Alternative Forum

■ "At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum." *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22. That the remedy in the alternative forum is less favorable to plaintiff is, under *Piper*, insufficient to warrant denial of the motion so long as it is reasonably adequate. Of course, an unfavorable change in the law may be a factor to be considered but it is not determinative unless the remedy is "clearly inadequate or unsatisfactory." *Id.* at 254, 102 S.Ct. at 265. It must be considered a relatively insignificant factor, in any event, in the cases of the foreign seamen.

■ Defendants bear the burden of proving the existence of an adequate forum. *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir.1983). They have identified two alternative forums, Singapore and Indonesia. The court in its order of October 22, 1984, found both to be "accessible to plaintiffs."

With respect to Singapore, defendants have submitted statements by Helen Yeo of the Singapore law firm of Chor Pee and Company. In substance, she states that

---

**4.** The Jones Act was amended on December 29, 1982, by Pub.L. 97–389, Title V, § 503(a), 96 Stat. 1955, adding a new subsection barring foreign seamen from maintaining certain actions under the Act or other United States maritime law. The legislation contains a "savings" clause providing that the new subsection will not apply to any actions arising out of an incident that occurred before the date of the amendment.

the courts of Singapore have jurisdiction over parties submitting to their jurisdiction which, under the Supreme Court of Judicature Act, may be by consent; that defendants may waive the statute of limitations; that discovery of documents and interrogatories are available but depositions are allowed only in certain circumstances; that witnesses may be subpoenaed within Singapore, and that Singapore permits third-party indemnity claims. (Reddick Decs.) Moreover, Singapore has adopted English common law with respect to claims for personal injury and English law generally with respect to air transport cases, and has a wrongful death statute. (McCloud Dec.)

In opposition, plaintiffs first submitted a declaration by Thomas Moon, an American lawyer who practiced with an American law firm in Bangkok for three years and then lived in Singapore for two years. Moon disputes that parties can waive the statute of limitations and lack of jurisdiction but cites no authority. He notes that trial would be before a single judge, that contingent fees are prohibited, and that little discovery would be available. While he points out various disadvantages a plaintiff might suffer in a Singapore court, his statements are too vague, general and unsupported to be given much weight. Subsequently plaintiffs submitted a "draft response" to certain questions from Singapore solicitors; those responses appear to the Court to be substantially consistent with the representations made by defendants.

With respect to Indonesia, defendants have submitted statements by Makarim & Taire S, attorneys and counselors at law in Jakarta. They state that Indonesian and foreign parties may submit to the jurisdiction of Indonesian courts by written consent; that under the Indonesian Civil Code, defendants may waive the statute of limitations; that the court can compel the attendance of witnesses; and that third-party indemnity claims are permitted. Indonesian

courts would apply Indonesian law, and remedies are available to employees and their survivors under Indonesia's Workmen's Compensation Law, under the Indonesian Civil Code for negligence, under the Indonesian Carriage by Air Act, and under the Warsaw Convention. (Reddick Decs.) Plaintiffs have made no significant countershowing.

On the basis of the foregoing analysis of Singapore and Indonesian law, reinforced by the protective conditions of this order, the Court determines that either jurisdiction would offer a reasonably adequate alternative forum for plaintiffs.[5]

2. The Private Interest Interest Factors

*Relative ease of access to sources of proof.* Plaintiffs argue that there is no dispute that the air crash was caused by pilot error, and that the only questions before the Court are who controlled the vessel, who is responsible for selecting Airfast, and what amount of damages should be awarded. These questions do not require production of evidence located in Indonesia or Singapore.

Defendants, on the other hand, deny that negligence on the part of Airfast is established as the sole cause of the crash. While the report of Indonesian authorities who investigated the accident attributed the crash to pilot error and weather conditions, there appears to be evidence of negligence by the controllers who cleared the aircraft for landing despite adverse weather conditions and may have given an incorrect altimeter setting. Inasmuch as the cause of the crash is at the heart of the issues in this litigation, it is essential for the parties to have access to all relevant evidence.

It is not disputed that the operative facts on which liability and damages are premised occurred in Indonesia, and to a lesser extent, in Singapore. These include the maintenance and operation of the aircraft

---

5. The Court also takes judicial notice of Singapore's status as a major center of international trade and commerce and the base of operation in South East Asia for many corporations, American and foreign. This facts lends weight to defendants' assertion of its adequacy as an alternative forum.

by Airfast, the chartering of the aircraft by Hudbay, and the actions of the crew and the Indonesian air traffic controllers. Eyewitnesses and other knowledgeable persons are located there. Records and physical evidence relating to the operation and crash of the aircraft, the activities of defendants, the injuries suffered by plaintiffs, and the post-accident investigation are also located there. It may be, as plaintiffs contend, that other evidence is scattered around the world, but none of it is shown to be located in this district. That the bulk of it is located in Singapore or Indonesia is demonstrated by plaintiffs' consolidated deposition notice which lists 33 named and countless other generically described persons as witnesses respecting the matters described above and notices their depositions to be taken in Toowoomba, Australia, Jakarta, Indonesia, and Singapore. (See Exhibit A, attached)

*Availability of compulsory process for and cost of obtaining the attendance of witnesses.* No material witness has been shown to be subject to the process of this Court. To compel defendants to go to trial without access to the live testimony of critical witnesses would obviously be unfair. *Gilbert*, 330 U.S. at 511, 67 S.Ct. at 844. As heretofore discussed, most if not all of the material witnesses appear to be available either in Indonesia or in Singapore where their attendance may be compelled by subpoena or court order.

Plaintiffs' deposition notice reflects the dimensions which the trials of these cases are likely to assume. A large number of witnesses can be expected to be called and all or nearly all of them would have to be brought from Southeast Asia, if possible, at great expense. Thus, even with willing witnesses, trials in this district would be burdensome.

*Jurisdiction over third-party defendants.* If the cases are litigated in this district, defendants will not be able to acquire personal jurisdiction over Airfast or other potential foreign third party defendants, such as Indonesia, against whom indemnity claims would lie. Their ability to implead indemnitors in Indonesia and Singapore but not in this district is a factor militating in favor of dismissal. *Piper*, 454 U.S. at 259, 102 S.Ct. at 267.

3. The Public Interest Factors

The three principles underlying the public interest factors are summarized in *Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C.Cir.1980), cited with approval by the Supreme Court in *Piper*:

> First, that courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it; second, that courts may legitimately encourage trial of controversies in the localities in which they arise; and third, that a court may validly consider its familiarity with governing law when deciding whether to retain jurisdiction over a case. Thus, even when the private conveniences of the litigants are nearly in balance, a trial court has discretion to grant forum non conveniens upon finding that retention of jurisdiction would be unduly burdensome to the community, that there is little or no public interest in the dispute, or that foreign law will predominate if jurisdiction is retained. (citations omitted.) *Id.* at 791–92.

These actions brought by foreign seamen lack any significant connection with this forum. Unlike *Piper*, no issue is raised concerning the design or manufacture of a California-produced product, or, for that matter, concerning any California-based activity.[6] While BMD's corporate base of operations is San Francisco, the day-to-day operations of the Brinkerhoff I were carried out in Indonesia and Singapore. California has no interest in these actions but Indonesia at least has a substantial one. These actions arise out of the crash of an Indonesian aircraft in Indonesian airspace under control of Indonesian air traffic con-

---

6. The fact that these actions arise out of conduct by Indonesians in Indonesia rather than out of design or manufacture of products in the United States makes them even stronger cases for transfer than *Piper*.

trollers, subject to Indonesian regulations, and investigated and reported on by the Indonesian government. That they should be adjudicated by Indonesian courts seems entirely appropriate.

The Court also takes into account the adverse impact of protracted litigation such as this on its own docket and on the ability of local litigants to get to trial, and the burden imposed on local jurors required to sit on these actions.

Finally, the application of the law of Indonesia if the actions are tried there is consistent with that country's interest in the controversy and not inconsistent with the convenience of these plaintiffs.

"Because the central purpose of any *forum non conveniens* inquiry is to ensure the trial is convenient, a foreign plaintiff's choice [of forum] deserves less deference." *Piper, supra,* 454 U.S. at 256, 102 S.Ct. at 266. In this case, all of the relevant factors support the conclusion that the actions in this forum must be dismissed subject to appropriate conditions.

**B. American Seamen**

 The cases of the American seamen raise the question whether *Piper Aircraft Co. v. Reyno, supra* affects the disposition of forum non conveniens motions in Jones Act cases.

Several circuits have followed the rule that once a court has determined that the Jones Act applies to a case, that case should not be dismissed for forum non conveniens. *Needham v. Phillips Petroleum Co. of Norway,* 719 F.2d 1481, 1483 (10th Cir.1983); *Szumlicz v. Norwegian American Line, Inc.,* 698 F.2d 1192, 1195 (11th Cir.1983). *Fisher v. Ajios Nicolas V,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied sub nom. Valmas Brothers Shipping S.A. v. Fisher,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981).

The Second Circuit has rejected that view. In *Cruz v. Maritime Co. of Philippines,* 702 F.2d 47 (2d Cir.1983), the court distinguished earlier circuit decisions on the ground that they had not involved forum non conveniens, and said:

That portion of *Bartholomew [v. Universe Tankships, Inc.,* 263 F.2d 437 (2nd Cir.1959) ]* cited in *Antypas [v. Cia Maritime San Basilio, S.A.,* 541 F.2d 307 (2nd Cir.1976)]* sets forth the general rule that "once federal law is found applicable the court's power to adjudicate must be exercised." *Id.* (emphasis added). The court in *Bartholomew* also recognized, however, that in "exceptional situations," such as where the abstention doctrine applies, the district court may dismiss despite the applicability of federal law. *See id.* A case involving forum non conveniens, like one involving abstention, presents just such an exceptional situation. See *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 841, 91 L.Ed. 1055 (1947) quoting *Canada Malting Co. v. Paterson Steamship, Ltd.,* 285 U.S. 413, 422–23, 52 S.Ct. 413, 415, 76 L.Ed. 837 (1932).

To summarize, when the Jones Act is applicable federal law is involved and the district court must exercise its power to adjudicate, absent some exceptional circumstances such as the application of the abstention doctrine or, as here, *the equitable principle of forum non conveniens.*

702 F.2d at 48 (emphasis added).

Under *Cruz,* therefore, the district court, on finding that the Jones Act applies, must adjudicate the case but adjudication encompasses the application in appropriate circumstances of the equitable doctrine of forum non conveniens.

The Ninth Circuit, in the recent decision in *Pereira v. Utah Transport, Inc.,* 764 F.2d 686 (9th Cir.1985), cited these cases and stated in dictum that it agreed with the Fifth, Tenth and Eleventh Circuits on the point that "a choice of law determination must be made before a district court dismisses a case under *forum non conveniens.*" (at 689) It did not address the specific issue whether, after *Piper,* a case subject to the Jones Act may be dismissed for forum non conveniens.

None of the decisions cited above considered the Supreme Court's decision in

*Piper.* The Court there reversed a court of appeals decision on the ground that it had "erred in holding that plaintiffs may defeat a motion to dismiss on the ground of forum non conveniens merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum." 454 U.S. at 247, 102 S.Ct. at 261. *Piper* involved product liability actions by foreign plaintiffs against two American manufacturers arising out of an air crash in Scotland. The district court, after evaluating the *Gilbert* factors, had dismissed for forum non conveniens. Among other things, it had determined that Pennsylvania law would apply to the claims against one defendant and Scottish law to the claims against the other. The court of appeals rejected the district court's analysis and found that American law would govern all claims. It concluded that dismissal was not justified when it would result in a change in the applicable law unfavorable to plaintiffs.

The Supreme Court rejected the court of appeals' reasoning as inconsistent with *Gilbert* under which "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." 454 U.S. at 249, 102 S.Ct. at 262.

In recent decisions the Fifth Circuit recognized the possible applicability of *Piper* to Jones Act cases. In *De Oliveira v. Delta Marine Drilling Co.,* 707 F.2d 843, 845 (5th Cir.1983), the court said in dictum:

> We have held that, if United States law applies, a federal court should entertain the suit. *Fisher v. Agios Nicolaos V,* 628 F.2d 308, 315 (5th Cir.1980), *cert. denied sub nom., Valmas Bros. Shipping, S.A. v. Fisher,* 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981); *Volyrakis v. M/V ISABELLE,* 668 F.2d 863 (5th Cir.1982). *But see Piper Aircraft v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419, 437 (1981).

*See also Koke v. Phillips Petroleum Co., supra,* 730 F.2d at 218. Subsequently in *Ali v. Offshore Co.,* 753 F.2d 1327 (5th Cir.1985), the district court had dismissed an action raising both Jones Act and product liability claims after finding that the Jones Act did not apply, without considering the forum non conveniens factors. The court of appeals, after discussing *Piper,* remanded with directions to apply the *Gilbert* factors to determine whether the action should be retained or dismissed. The court said specifically:

> In applying the *Gulf Oil* test, the court should consider the *Gulf Oil* factors *both as they pertain to the Jones Act claims and the product liability claims.*

753 F.2d at 1333 (emphasis added).

In a footnote the court added:

> In contrast to the choice of law analysis rejected in *Piper* the choice of law decision in the Jones Act context is a relatively simple one and is an easy means of reaching a preliminary decision on the forum non conveniens issue. *Litigants remain free to demonstrate that, although United States law would apply, the full panoply of the Gulf Oil analysis leads to the conclusion that the United States forum is inconvenient.*

*Id.,* n. 13 (emphasis added).

This statement, albeit dictum, strongly suggests that a Jones Act case may be dismissed for forum non conveniens. Inasmuch as it is found in that part of the opinion which dealt with the product liability claim, its full significance remains clouded.

*Piper,* of course, involved foreign plaintiffs but nothing in that decision suggests that the rule would be different for American plaintiffs. It is also true that it was a product liability action under state law, not a Jones Act case. *Piper,* however, inferentially rejected the notion that forum non conveniens does not apply to cases under the Jones Act. It did so by quoting the following statement from the Third Circuit's opinion which it reversed:

[I]t is apparent that the dismissal would work a change in the applicable law so that the plaintiff's strict liability claim would be eliminated from the case. But ... a dismissal for forum non conveniens, like a statutory transfer, "should not, despite its convenience, result in a change in the applicable law." Only when American law is not applicable, or when the foreign jurisdiction would, as a matter of its own choice of law, give the plaintiff the benefit of the claim to which she is entitled here, would dismissal be justified. [*Reyno v. Piper Aircraft Co.,*] 630 F.2d [149], at 163–64 [(1980)] (footnote omitted) (quoting *DeMateos v. Texaco, Inc.,* 562 F.2d 895, 899 (CA3 1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 494 (1978)).

454 U.S. at 246, 102 S.Ct. at 261.

*DeMateos,* on which the Third Circuit had relied, was in fact a case brought under the Jones Act in which the court upheld an order dismissing for forum non conveniens only after determining that the Jones Act did not apply.

The Supreme Court, therefore, clearly had before it the concept of forum non conveniens as it had been applied in Jones Act cases. Nevertheless it carved out no exception to its broad holding that

> The Court of Appeals erred in holding plaintiffs may defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum. The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry.

454 U.S. at 247, 102 S.Ct. at 261.

Because the deceased seamen on whose behalf these actions were brought were Americans at the time of their death in the course of their duties, weight must be given to the Congressional purpose of affording a liberal remedy for injury or death of American seamen. Nothing in the statute itself, however, bars dismissal of such a case for forum non conveniens. In addition a strong presumption attaches to the choice of forum by those plaintiffs who are residents of the United States, although the presence of American plaintiffs in and of itself is not sufficient to bar dismissal. *Cheng, supra,* 708 F.2d at 1411.

*Piper* instructs, however, that "the central purpose of any *forum non conveniens* inquiry is to ensure the trial is convenient ...." *Piper, supra,* 454 U.S. at 256, 102 S.Ct. at 261. The relevant factors, which have been discussed in the preceding part of this opinion, demonstrate convincingly "that trial in the chosen forum would be unnecessarily burdensome for the defendant... [and] the court." *Id.* 454 U.S. at 256 n. 23, 102 S.Ct. at 266 n. 23. In reaching that conclusion, the Court takes into account also that these are not run-of-the-mill seamen's injury cases. These claims do not arise out of a typical maritime accident where the injury occurs on or about a vessel and the evidence is largely under the shipowner's control. Instead, they are analogous to foreign aircrash cases in which the relevant evidence is to be found abroad outside the control of the parties.

### Conclusion

The issue before the Court is whether trial in plaintiffs' chosen forum would be unnecessarily burdensome for defendants. Given the availability of reasonably adequate alternative forums, the relative ease of access to sources of proof in those forums, and the unavailability of compulsory process over any material witnesses, the expense of producing willing witnesses, the inability to acquire jurisdiction over third-party defendants, the lack of any significant connection of the actions and the burdens of a trial in this forum, private and public interest factors outweigh plaintiffs' forum preference, even in the four cases governed by American law.

In order that each plaintiff's interests will be adequately protected, the order dismissing these actions will become effective as to any defendant upon the filing with this Court within 120 days from the filing

of this order of a certificate on behalf of the defendant stating that:

1. Defendant has submitted to service of process and jurisdiction in whatever courts of Indonesia and Singapore any plaintiff shall have filed an action within ninety days from the date of filing of this order ("the new actions").

2. Defendant has formally and effectively waived any defense under the statute of limitations arising in any of the new actions which was not available at the time the instant actions were filed in this Court.

3. Defendant agrees to make available in any of the new actions witnesses (either for trial or for deposition) and documents within its control.

4. Defendant waives any objection to the use in any of the new actions of any product of discovery filed in the instant actions.

5. Defendant agrees to satisfy any final judgment rendered against it in any of the new actions.

This order shall become final (i) as to any defendant upon the filing by that defendant of the foregoing certificate in form satisfactory to the court or (ii) as to any plaintiff upon that plaintiff's failure to have filed a new action upon the expiration of ninety days from the date of filing of this order, whichever shall occur first.

The Court is of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. The Court therefore certifies the following questions for interlocutory appeal:

1. Does the Jones Act apply to the actions brought by or on behalf of foreign nationals?

2. To the extent that the Jones Act applies to any of these actions, does it preclude conditional dismissal on forum non conveniens grounds?

IT IS SO ORDERED.

## ORDER

■ Defendant Dome Petroleum Corp. has moved pursuant to Cal.Code Civ.Pro. § 877.6 for a determination that the settlements entered into between Dome and plaintiffs are in good faith. After reviewing the papers filed by the parties and the record in these actions, and having heard argument on July 25, 1985, the Court made oral findings on the record that the settlements between Dome and the plaintiffs were made in good faith.

The question taken under submission was whether this Court could render such an order under § 877.6 in actions under the Jones Act and under general maritime law. The issue is whether the release and contribution rules under §§ 875 *et seq.* conflict with maritime law applicable to those actions.

Sections 875 *et seq.* are based on the premise that joint tortfeasors are jointly and severally liable to pay a judgment regardless of their comparative fault, that a tortfeasor who has discharged a judgment is entitled to contribution from other defendants liable for the judgment, that a defendant who has settled is not thereby immune from liability in the absence of an order under § 877.6, and that the amount a plaintiff is entitled to collect on a judgment will be reduced only pro tanto by the amount he has received from settlements with other defendants.

Whether these rules would be applied to Jones Act cases in the Ninth Circuit is not known. The Court has discovered no cases which address these questions sufficiently comprehensively to enable one to make a judgment whether a potential conflict exists with the California statute.

In *Edmonds v. Compagnie General Transatl,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the Supreme Court stated that it considered the general rule in maritime law to allow "an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the inci-

dent." *Id.* at 260, 99 S.Ct. at 2756. Nonetheless some courts have entered judgments in multi-defendant Jones Act cases apportioning responsibility among defendants. This practice appears to be approved at least in the Fifth Circuit. *See Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir.1985); *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir.1979). It was also followed in one reported case in this District by Judge Poole. *Kizer v. Peter Kiewit Sons' Co.*, 489 F.Supp. 835 (1980). Pre-judgment apportionment of liability for damages based on comparative fault eliminates the need for contribution since no defendant would ever have to pay more than its share. Cf. *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 500-01 (5th Cir.1982) (decision concerns indemnity which differs from contribution; the former transfers responsibility while the latter simply divides it). Hence, if this procedure were followed, the procedure under §§ 875 *et. seq.* would be rendered irrelevant.

Another alternative open to the courts would be to adhere to the conventional rule of joint and several liability but to reduce plaintiff's recovery from a judgment debtor not by the amount collected from settlements, but by the amount of damage liability allocable to other defendants on the basis of comparative fault. The authority for this approach is sparse, if it exists at all in maritime cases. *See Donovan v. Robbins*, 752 F.2d 1170, 1180 (7th Cir.1984). The much cited footnote 5 in *Doyle v. United States*, 441 F.Supp. 701, 710 (D.S.C. 1977), which explains and advocates it, is largely unsupported. It conflicts, of course, with the approach under the California statute (§ 877), derived from the Uniform Contribution Among Tort Feasors Act (§ 4), under which the liability of a joint tortfeasor is reduced only by the amount received by plaintiff from settlement.

This brief and admittedly superficial glance at the law satisfies the Court that the possibility of a conflict with existing Jones Act law is sufficiently remote not to constitute an obstacle to application of § 877.6 here. Whether ultimately a claim for contribution by other defendants in these actions may come before some court is a matter of speculation. If it does, it will be for that court, wherever it may be, to adjudicate the rights and liabilities of the defendants inter se. Even the question of reduction of any plaintiff's judgment lies in the distant future. Hence any views expressed by this Court in the matter would be pure dictum.

For these reasons, the Court is satisfied that there is at this time no ground for declining to exercise its power under § 877.6 to determine the settlements to have been made in good faith and it hereby does so for the reasons stated orally on the record of the hearing. The consequences of this ruling are left to be determined another day.

IT IS SO ORDERED.

### EXHIBIT A

July 19, 1984

### NOTICE OF INTENT TO TAKE ORAL DEPOSITIONS

TO: Defendants, BRINKERHOFF MARITIME DRILLING, INC., BRINKERHOFF MARITIME DRILLING, S.A. and BRINKERHOFF MARITIME DRILLING PTE, LTD., by and through their attorney of record, Mr. Rex M. Clack of Derby, Cook, Quinby & Tweedt, 333 Market Street Suite 2800, San Francisco, California 94105.

TO: Defendants, ATLANTIC RICHFIELD CO. and ARCO OIL & GAS COMPANY by and through their attorney of record, Mr. James M. Derr of Belcher, Henzie, Biegenzahan, Chertok & Walker, 333 South Hope Street, Suite 3650, Los Angeles, California 90071

TO: Defendants, HUDBAY OIL (MALACCA STRAIT) LTD., HUDBAY OIL (INDONESIA) LTD. and DOME PETROLEUM CORP., by and through their attorney of record, Mr. Moris Davidovitz of Maloney, Chase, Fisher &

Hurst, 4 Embarcadero Center, San Francisco California 94111

TO: Defendant, HALLIBURTON COMPANY, by and through its attorney of record, Mr. Grayson S. Staring of Lillick, McHose & Charles, Two Embarcadero Center, San Francisco, California 94111.

TO: Defendant, McCLELLAND ENGINEERS, INC., by and through its attorney of record, Mr. Harold Albert Stone of Gudmunson, Siggins & Stone, Russ Building, Suite 710, 235 Montgomery Street, San Francisco, California 94104.

TO: Defendant, OCEANEERING INTERNATIONAL, INC., by and through its attorney of record, Mr. Vernon L. Goodin of Bronson, Bronson & McKinnon, 555 California Street, San Francisco, California 94104.

TO: Defendant, CONOCO, INC., by and through its attorney of record, Mr. Robert J. Finan of Finan, White & Morrison, 333 Broadway, Suite 200, San Francisco, California 94133

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civ Procedure 30(b)(6), the Plaintiffs, by and through their attorney of record, BENTON MUSSLEWHITE, will take the oral deposition, before an officer authorized to administer oaths of the following witnesses:

a. Dr. Michael N. Fox, M.A.P.S., M.A.S. G.P.P. (U.S.), Psychologist;

b. Rael Duffie, Psysiotherapist;

c. Kerrie Dixon of International Rehabilitation Associates;

d. Dr. Bookles;

e. Custodian of records and treating physicians or rehabilitation specialist from the Connolly Street Rehabilitation Center, Perth, Western Australia;

f. Sir George Bedbrook, treating physician;

g. Custodian of the records and accounts of Saint John of God Hospital, Subiaco;

h. Dr. E.G. Griffiths;

i. Custodian of records and accounts of Royal Perth Rehabilitation hospital;

j. Jim Croft, barge foreman, who is Australian, if located, can be arranged in Australia;

k. The depositions of friends, acquaintances and relatives of Grunke who knew of him both before and after the accident;

l. Patrick Paul Grunke, himself;

m. Mr. R. D. McKellar-Hall and Mr. N. J. Bedolin

Said depositions will commence at 10:00 A.M. on Monday, October 15, 1984 and will continue on Tuesday, October 16, 1984 Wednesday, October 17, 1984 and Thursday, October 18, 1984 at the office of Patrick Nunan of CLEARY & LEE, 2 Russell Street, Toowoomba, Australia and other places designated thereafter.

On Monday, October 22, 1984, beginning at 10:00 A.M., in Jakarta, Indonesia at the Jarkarta Hilton Hotel, and continuing on Tuesday, October 23, 1984, Wednesday October 24, 1984, and Thursday, October 25, 1984 at other places designated thereafter, the depositions of the following witnesses will be taken:

a. Custodian of the records and principal investigator of the investigating authorities of Indonesia who investigated the air crash in question;

b. Any witness who lived in and around the site of the crash in Pekanbaru, Indonesia;

c. The individuals who were present in the control tower and/or control room at the time of the attempted landing by the aircraft in question;

d. The Air Controllers at Pekanbaru Airport;

e. Any and all officers or representatives of PT Airfast Services Indonesia;

f. Mr. E.C. Andrews, President of PT Airfast Services Indonesia;

g. Mr. T.E. Steen, General Manager of PT Airfast Services Indonesia;

h. Florence C. Forrester (if found in Indonesia);

i. Mr. A. S. Clark, Contracts Manager of PT Airfast Services Indonesia;

j. Tony Clark of the Jarkarta office of PT Airfast Services Indonesia;

k. R. G. Sawka of Hudbay Oil (Malacca Atrait) Ltd. in Jakarta;

l. Custodian of the records and principal officer or person with knowledge with the Indonesian government which certifies and authorizes flights into Indonesia by commercial aircraft (the equivalent of the CAB and National Transportation Safety Board in the United States);

m. Don Burgland, Neal Craig, Ron Panas, Ian Scott, Jim Croft, all members of the shifts of the crews at the time of the accident in question;

n. Custodian of records and accounts of the hospitals in Pekanbaru and/or Jakarta in which any of the Plaintiffs were sent for care and treatment;

o. All doctors who treated all Plaintiffs in Pekanbaru and/or Jakarta;

p. The custodian of the records and principal authority who issued the death certificates;

q. The principal and operating manager in Jakarta and/or Pekanbaru or any other location in Indonesia of the following companies; Brinkerhoff Maritime Drilling Corporation, any foreign subsidiary of Brinkerhoff Maritime Drilling Corporation, or subsidiary that has an office in the Far East; Hudbay Oil (Malacca Strait) Ltd. and any other sister compaines or subsidiaries of the Hudbay group of companies that have offices in the Far East, particularly Indonesia; Atlantic Richfield Indonesia, Inc., and all other Atlantic Richfield Indonesia, Inc., and all other Atlantic Richfield companies who may have offices in the Far East, particularly Indonesia; Oceaneering International, Inc., and all of its subsidiaries or sister companies who have offices in the Far East, particularly in Indonesia; McClelland Engineers, Inc., and any of its subsidiaries or related companies who have offices in the far East, particularly in Indonesia; Halliburton Industries, Inc., or any of its subsidiaries or related companies that have ofices in the Far East, particularly in Indonesia;

r. Caltex Hospital in Pekanbaru or Jakarta.

On Monday, October 29, 1984, commencing at 10:00 A.M. in Singapore at the Singapore Shangai La Hotel, and continuing on Tuesday, October 30, 1984, Wednesday, October 31, 1984, Thursday, November 1, 1984 and Friday, November 2, 1984 at other places designated thereafter, the depositions of the following witnesses will be taken:

a. Chan Luck Chee (if wanted by Defendants);

b. Vyner Albuquerque (if wanted by Defendants);

c. Mrs. Shereen Ramona Zipfel (if wanted by Defendants);

d. Mrs. Ten Fong Craig (if wanted by Defendants);

e. Dr. C. M. Ling;

f. The custodian of the records and accounts of Mount Elizabeth Hospital;

g. All witnesses named above in connection with Jakarta and Pekanbaru, Indonesia who are present in Singapore rather than Indonesia, including but not limited to the various Corporate representatives of the Defendant corporations and their subsidiaries or related companies; investigative authorities; representatives and officers of PT Airfast of Singapore as well as PT Airfast Indonesia; members of the crew of the BRINKERHOFF I at the accident in question on either shift;

h. All officers of the Defendant coroprations and their subsidiaries and/or related companies, as named above, whose office is in Singapore and who

is the managing officer of those particular offices;

i. All investigative authorities of Singapore who may have investigated the crash in question;

j. All authority of Singapore who may have issued licenses and/or renewed licenses with respect to commercial operation of aircraft in or out of Singapore;

k. Mr. Dave Lowry;

l. Mr. Larry Coe;

m. Dr. Freddie B. T. Chew;

n. Custodian of accounts and records at Saint Mark's Hospital in Singapore;

o. Custodian of records and accounts at Mount Alverina Hospital;

p. Dr. Loong Si Chin;

q. J. Peter Gemeinhardt of McClelland Engineers, S.A.;

r. Person in charge of maintenance of PT Airfast planes at Seletar Airport in Singapore;

s. Rod Stanley of Oceaneering;

t. Keith Manson of Oceaneering;

u. Dr. N. Knunaratnam;

v. Custodian of records and accounts at Singapore General Hospital, Singapore;

w. Dr. R. Sundarason;

x. Any other witnesses or persons who were on board the PT Airfast plan that crashed who reside in singapore, and any other witnesses or persons who worked in supervisory or responsible capacities on board the BRINKERHOFF I during the period of time that the accident in question occurred;

y. Any other doctors or hospitals in which any of the Plaintiffs might have been treated not mentioned above and who are located in Singapore.

z. Various friends, acquaintances and relatives of the decedents and Plaintiffs who knew the Plaintiffs and who are located in Singapore.

Plaintiff requests that all of the above witnesses bring all documents which pertain to the matters mentioned in connection with the Notice of Depositions and all documents that may have any connection with the accident in question, either directly or indirectly.

You are invited to attend and cross-examine.

Respectfully submitted,
LAW OFFICES OF BENTON MUSSLEWHITE, INC.
BY: /s/ Benton Musslewhite
Benton Musslewhite
BY: /s/ John O'Quinn
John O'Quinn
BY: /s/ Lyle C. Cavin, Jr.
Lyle C. Cavin, Jr.